Christopher Porrino, Esq.
Mark S. Heinzelmann, Esq.
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
T: 973.597.2500
F: 973.597.2400

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RIDGE CROSSING LIMITED LIABILITY COMPANY, RIDGE CROSSING 1 URBAN RENEWAL LLC, RIDGE CROSSING 6-1 URBAN RENEWAL LLC, RIDGE CROSSING 6-2 URBAN RENEWAL LLC, RIDGE CROSSING 6-3 URBAN RENEWAL LLC, RIDGE CROSSING 6-4 URBAN RENEWAL LLC, RIDGE CROSSING 6-5 LLC, AND RIDGE CROSSING 6-6 LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> ALENT, INC., ALPHA ASSEMBLY SOLUTIONS, INC., JOHN DOES 1-10, and XYZ CORPS. 1-10, <br><br> Defendants. | Document Electronically Filed <br><br> Civil Action No.: <br><br><br><br> **COMPLAINT** |

Plaintiffs Ridge Crossing Limited Liability Company, Ridge Crossing 1 Urban Renewal LLC, Ridge Crossing 6-1 Urban Renewal LLC, Ridge Crossing 6-2 Urban Renewal LLC, Ridge Crossing 6-3 Urban Renewal LLC, Ridge Crossing 6-4 Urban Renewal LLC, Ridge Crossing 6-5 LLC, and Ridge Crossing 6-6, LLC

(collectively, "Plaintiffs"), by way of Complaint against Defendants, Alent, Inc., Alpha Assembly Solutions, Inc., John Does 1-10, and XYZ Corps. 1-10 (collectively, "Defendants"), allege and say:

## THE PARTIES, JURISDICTION AND VENUE

1.      Plaintiffs are New Jersey limited liability companies, which have an address at P.O. Box 1009, Bayonne, NJ 07002.

2.      Plaintiffs, their members and managers all reside and are domiciled in the State of New Jersey.

3.      Defendant, Alent, Inc. ("Alent"), is a Rhode Island corporation with a principal place of business at One Weybosset Hill, Providence, Rhode Island 02903.

4.      Defendant, Alpha Assembly Solutions, Inc. ("Alpha Assembly"), is a Delaware corporation with a principal place of business at 245 Freight Street, Waterbury, Connecticut 06702.

5.      John Does 1-10, and XYZ Corps. 1-10 are fictitiously pled individuals and companies, respectively, that upon information and belief may be past or present owners and/or affiliates of Alent and Alpha Assembly and may be legally responsible for the acts and omissions of Alent and Alpha Assembly, as alleged herein.  The full extent and nature of the corporate structures and ownership of Alent, Alpha Assembly and their parent entities are not fully known at this time

and will be explored during discovery. Plaintiffs reserve the right to amend their Complaint to amend and add these fictitiously pled parties, which may include, among others, Platform Specialty Productions Corporation ("Platform") and Element Solutions Inc. ("Element"), as direct defendants should corporate liability be suggested or established.

6.     This Court has subject matter jurisdiction over this matter as Section 113(b) of the Comprehensive Environmental Response, Compensation and Recovery Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, grants federal district courts original jurisdiction over all controversies arising under CERCLA, and this matter involves "releases" of "hazardous substances" at Plaintiffs' properties in Kearny, New Jersey.

7.     This Court also has subject matter pursuant to the diversity statute, 28 U.S.C. § 1332(a)(1), because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

8.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2) because substantial parts of the events or omissions giving rise to the claim occurred within this District, the subject real properties are located in this District, and Plaintiffs' members and managers are all domiciled in New Jersey.

## BACKGROUND

**Defendants Various Corporate Transactions and Evolutions**

9.      Alpha Metals, Inc. ("Alpha Metals") historically manufactured solder fluxes, cleaners, and other chemicals used in circuit board manufacturing and assembly.  These operations included, among other things, the use of chlorinated solvents in the rinsing processes.

10.     In 1984, Alpha Metals was acquired by the Cookson Group, a publicly traded company in the United Kingdom.

11.     In 2012, Cookson Group's materials division, which included the supply of materials and chemicals to the electronics, automotive, industrial and construction markets and the Alpha Metals' business, demerged into Alent.

12.     In July 2015, Platform acquired Alent in a $2.1 billion transaction.

13.     In or about 2018 or 2019, Platform sold its business in another $4.2 billion transaction, and Platform was renamed as Element.

14.     As set forth in more detail below, throughout Plaintiffs ongoing redevelopment of the subject properties and the remediation thereof, Plaintiffs received direction from various representatives of Alent and its parent entities, Platform and Element, and even entered into written agreements with Alent, regarding access to and remediation of the subject properties.

15.     Documentation in Plaintiffs' possession also reveals that, at various points in time, Alent and its parent entities, Platform and Element, directly retained a licensed site remediation professional ("LSRP") to address the investigation and remediation of hazardous substances at the subject properties resulting from historical operations conducted there by Alpha Metals and Alent.

16.     The representatives and individuals involved in the environmental investigation and remediation of the subject properties have all consistently been affiliated with Alent and its parent entities, Platform and Element.

17.     Alent has also provided documentation to Plaintiffs suggesting that Alpha Assembly is a successor to Alpha Metals and/or Alent.

18.     Unless stated otherwise, Alent and Alpha Assembly, including their predecessor Alpha Metals, are referred to hereinafter as "Defendants."

## Historical Background of the Contamination at the Site and Defendants' Initial Remedial Activities

19.    In or about 1966, Alpha Metals began leasing and utilizing space at the Jeryl Industries Industrial Park, then owned by Jeryl Industrial Park, Inc. (the "Jeryl Owner"), located at 590 Belleville Turnpike in Kearny, New Jersey, also being previously designated as Block 134, Lots 1 and 6 (until Plaintiffs subdivided the Site, as explained further below), consisting of approximately 25.5 acres (the "Site").

20.    The east portion of the Site, which terminated at Belleville Turnpike, housed several dilapidated industrial buildings (hereinafter, "590 Belleville").

21.    The west portion of the Site housed several more industrial buildings, which were located at the top of the Site adjacent to Schuyler Avenue (hereinafter, "680 Schuyler").

22.    From 1966 until 1987, Defendants leased portions of the Site at both 590 Belleville and 680 Schuyler for manufacturing of solder fluxes, cleaners, and other chemicals used in circuit board manufacturing and assembly and performing related warehousing.

23.    In 1987, Defendants converted Site operations to the manufacture of PVC plumbing cements.

24.    In 1991, Defendants' operations were relocated to a facility in Florida.

25.    During Defendants' historical operations at the Site, Defendants leased Building 28 on the 680 Schuyler portion of the Site for manufacturing, and Buildings 23 and 24 on the 590 Belleville portion of the Site for storage of finished product, and they also used common areas of the Site for operations and access to the leased buildings.  A depiction of the Site as it existed during or shortly after Defendants' operations is attached hereto as Exhibit A.

26.    Defendants' historical operations involved the use, storage, manufacture, disposal, and—ultimately—discharge and release of hazardous substances as those terms are defined under applicable environmental law, including CERCLA and the New Jersey Spill Compensation and Control Act ("Spill Act").

27.    In or about 1992, Defendants notified the New Jersey Department of Environmental Protection ("NJDEP") of its intent to terminate operations at the Site and initiated environmental compliance activities under the Environmental Cleanup Responsibility Act, which is now known as the Industrial Site Recovery Act, N.J.S.A. 13:1K-6, *et seq.* ("ISRA").

28.    Defendants retained Enviro-Sciences (of Delaware), Inc. ("ES") to perform the ISRA work, and—in or around 2012, following passage of the New Jersey Site Remediation Reform Act ("SRRA")—they retained Robert Workman as their LSRP for the Site.

29.    Through subsequent environmental investigation, Defendants and ES determined that soil and groundwater at the Site had been impacted by past releases and discharges of chlorinated solvents and other hazardous substances, which resulted from: (i) Defendants' leaking storage tank systems; (ii) process rinse water discharged by Defendants through "scupper" drains to the exterior ground surface; and (iii) process and cleaning water discharge by Defendants to on-Site drywells and septic systems.

30.    The hazardous substances detected and discharged/released at the Site include, among others, vinyl chloride ("VC"), cis-1,2-dichloroethene ("DCE"), trichloroethylene ("TCE"), tetrachloroethylene ("PCE"), benzene, chlorobenzene, and 1,4-dichlorobenzene, which are all hazardous substances under New Jersey and federal environmental statutes and regulations, including the Spill Act and CERCLA.

31.    As a result of those past releases of hazardous substances, as documented by Defendants' consultants, Defendants are dischargers and persons in any way responsible under the Spill Act and are liable for their releases under CERCLA.   Defendants also continue to be responsible for remediating the environmental conditions at the Site under ISRA.

32.    From 1993 through 2008, various remedial investigative phases were conducted by ES on behalf of Defendants to characterize and delineate soil and

groundwater contamination at Defendants' former leasehold and common areas of the Site, as well as adjacent properties.

33.    From January 2006 through March 2008, ES submitted numerous remedial investigation reports on behalf of Defendants to the NJDEP outlining the investigations undertaken at the Site.

34.    On April 9, 2008, the NJDEP, in a 16-page letter, detailed various deficiencies in Defendants' submissions and directed that Defendants and ES take corrective action.    Among other things, the NJDEP observed that (i) ES had discovered potential comingled aspects of hazardous substances at the Site; and (ii) contaminants had migrated downgradient and in southerly and easterly directions away from the Site.    As such, the NJDEP directed, among other things, that all areas with comingled contaminants as a result of Alpha's discharges must be remediated by Defendants and that additional delineation of the hazardous substances and their migration was to be completed by Defendants.

35.    After the NJDEP issued its April 9, 2008 letter and until Plaintiffs became actively involved in the ownership and redevelopment (and, ultimately, remediation) of the Site in or around 2013 (as explained further below), Defendants and ES did very little to advance any further environmental investigation or remediation at the Site.

**Plaintiffs' Acquisition and Planned Redevelopment at the Site**

36.    In 2013, the Township of Kearny ("Kearny") adopted that certain Industrial Park Redevelopment Plan (the "Redevelopment Plan"), which called for the redevelopment of blighted and environmentally contaminated sites in Kearny, which plan included the Site.

37.    Kearny later designated Plaintiff Ridge Crossing Limited Liability Company ("Ridge Crossing") as redeveloper of the Site under the Redevelopment Plan.

38.    Ridge Crossing's redevelopment plan was to transform the blighted Jeryl Industrial Park, *i.e.*, the Site, which was subject to repeated and severe flooding, littered with deteriorating industrial buildings, and subject to Defendants' environmental contamination, into a clean, diversified, and interconnected redevelopment project consisting of a multi-unit residential development on the 680 Schuyler portion of the Site and a state-of-the-art logistics center on the 590 Belleville portion of the Site (the "Redevelopment Project").

39.    In furtherance of the Redevelopment Project, on or about August 15, 2013, Ridge Crossing entered into a ground lease with Jeryl Owner (the "Ground Lease"), under which, among other things, Ridge Crossing was assigned full control of and granted an option to purchase the Site.

40.    After entering into the Ground Lease, Ridge Crossing retained a team of professionals to assist with the Redevelopment Project, which included RT Environmental Services, Inc. ("RT Environmental"), an environmental consultant.

41.    RT Environmental was initially tasked with reviewing the ongoing environmental investigation and remediation by Defendants and ES at the Site.

42.    As Ridge Crossing moved forward with its Redevelopment Project, it subdivided the Site and formed new "Ridge Crossing" entities, *i.e.*, the various Plaintiffs in this matter, to own and redevelop each subdivided parcel.  As a result, Plaintiffs now consist of all of the owners of the Site, as subdivided.   For convenience, the terms "Ridge Crossing" or "Plaintiffs" are hereinafter used to collectively refer to the named Plaintiffs.

43.    In light of Defendants' ongoing responsibility to remediate the environmental contamination at the Site, the apparent inaction by Defendants over the prior years, and the outstanding deficiencies noted by the NJDEP with respect to Defendants' stalled environmental investigations, Ridge Crossing requested an agreement with Defendants that would outline how the outstanding environmental investigation and remediation at the Site would be completed in concert with Plaintiffs' Redevelopment Project.

44.    In March 2015, Jeryl Owner, Ridge Crossing, and Alent negotiated and entered into a Remediation Access Agreement (the "Access Agreement"), which required Alent, at its sole cost and expense, to perform and complete all environmental remediation work at the Site as required by the NJDEP, environmental laws (as defined therein), and Defendants' LSRP.

45.    All of Defendants' environmental work was to be performed in a good and workmanlike manner that is consistent with prevailing professional standards for such work and/or remediation.

46.    Defendants further agreed to indemnify Ridge Crossing as a result of their negligence and/or failure to perform and complete the environmental work.

47.    Shortly after the execution of the Access Agreement, and in partial reliance thereon, in or about June 2015, Ridge Crossing closed on the purchase of the Site from Jeryl Owner.

**Defendants' Continued Failures to Timely Remediate their Contamination at the Site**

48.    By December 2015 and early 2016, *i.e.* shortly after the acquisition of Alent by Platform and the parties' negotiation and execution of the Access Agreement, Defendants' failure to proceed with its environmental investigation and remediation became the subject of contention and ongoing correspondence between RT Environmental and ES.

49.    For instance, by letter dated March 1, 2016, RT Environmental wrote to ES and raised several concerns regarding the incomplete and delayed environmental investigation and ES's proposed remediation methods for the 680 Schuyler portion of the Site.

50.    Defendants and RT Environmental also made repeated requests to Defendants and ES for remediation work product, including remedial investigation reports ("RIRs"), which were either consistently delayed or never produced.

51.    As a result of Defendants' ongoing delays and failures in relation to the environmental work at the Site, by letter dated March 7, 2016, Ridge Crossing declared Defendants to be in material breach of the Access Agreement.

52.    To mitigate its losses in relation to Defendants' breach and remediation failures, but without assuming any responsibility therefor, Ridge Crossing authorized RT Environmental to begin preparing a remedial action work plan ("RAWP") to address the remediation of the environmental contamination caused by Defendants.

53.    Ridge Crossing thereafter advised Defendants that it was prepared to direct its consultants and contractors to proceed in accordance with the RAWP should Defendants fail to do so.

54.    On March 30, 2016, Ridge Crossing, Defendants, and RT Environmental participated in a meeting related to the Site.

55.    Prior to the meeting, Defendants retained a new environmental consultant, GEI Consultants, Inc. ("GEI").  Defendants advised that GEI was being brought in to "make recommendations" regarding the environmental remediation issues associated with the Site.

56.    During the March 30, 2016 meeting, Ridge Crossing reiterated that Defendants' failure to properly and timely perform remediation at the Site was delaying the Redevelopment Project and creating other unacceptable risks to Plaintiffs.

57.    In response, Defendants promised to perform the environmental work in a manner that would satisfy Ridge Crossing's redevelopment objectives.

58.    Following the meeting, Defendants repeatedly assured Ridge Crossing that they would fulfill their environmental obligations and restart active investigation and remediation at the Site.

59.    On May 2, 2016, Defendants finally produced to Ridge Crossing draft RIRs for the Site.

60.    On May 6, 2016, RT Environmental outlined significant deficiencies in the draft RIRs, noting inadequate delineation, numerous technical uncertainties, and dubious remedial approaches, among other material defects.

61.    On May 20, 2016, during a follow-up conference call and in apparent recognition of the remedial failures at the Site up to that point, Defendants advised

that GEI would be permanently replacing ES as Defendants' consultant and LSRP at the Site, and they promised that GEI would move the remediation forward in a more reliable and timely manner. They also promised that the RIR deficiencies would be addressed and RAWPs for the Site produced by November 2016.

62.    Over the course of the next several months, GEI performed various predesign investigations at the Site and promised the development of several remedial actions, but those potential remedial actions continuously changed, thus causing further delay.

63.    Despite Defendants' promise to produce new RAWPS by November 2016, Ridge Crossing still had not received any RAWPs from Defendants as of April 2017.

64.    At or around that time, Defendants informed Ridge Crossing that, rather than move forward with the substantive remediation, they had instead asked GEI to investigate Defendants' nexus to the contamination at the Site.

65.    At the completion of that work, Defendants represented to Ridge Crossing that GEI's findings, which were received on April 25, 2017, had confirmed Defendants' connection to and responsibility for the environmental conditions at and associated with the Site.

66.    By letter dated April 27, 2017, Ridge Crossing provided notice to Defendants that Ridge Crossing's ability to move forward with the Redevelopment

Project had been delayed by at least another year due to Defendants' failure to follow the NJDEP's guidance, produce RAWPs, and begin (let alone complete) any remedial actions at the Site.

67.    By letter dated May 12, 2017, Defendants proposed that the parties enter into an extension of the Access Agreement, which at that time was soon to expire.

68.    In June and July 2017, Defendants finally provided Ridge Crossing and RT Environmental with draft RAWPs for each portion of the Site.

69.    On July 19, 2017, RT Environmental provided GEI with comments on the draft RAWPs.

70.    On July 27, 2017, the parties and their LSRPs met to discuss the draft RAWPs, an extension of the Access Agreement, and the ongoing negative impacts to Ridge Crossing's Redevelopment Project.

71.    At that meeting, GEI agreed to submit an updated RAWP for the 590 Belleville portion of the Site in response to RT Environmental's comments.

72.    As to the 680 Schuyler portion of the Site, Defendants agreed to address a variety of issues raised by Plaintiffs, including vapor intrusion and the development of a vapor barrier in connection with the Redevelopment Project.

73.     While the Access Agreement had expired by this time, Ridge Crossing continued to allow Defendants access to the Site while discussions on these issues were ongoing.

74.     On August 30, 2017, Defendants filed an updated RAWP for the 590 Belleville Turnpike portion of the Site with the NJDEP, but they were not prepared to file a RAWP for the 680 Schuyler portion of the Site.

75.     On October 17, 2017, Ridge Crossing and Defendants entered into a First Amendment to Remediation Access Agreement, made retroactively effective to July 2, 2017 (the "First Amendment").

76.     The First Amendment extended the non-exclusive, non-transferable, non-assignable, and temporary license granted by Ridge Crossing under the Access Agreement to May 31, 2018.

77.     As work was ongoing, by letter dated May 31, 2018, GEI represented to Ridge Crossing that it had completed active remediation work at Building 24 on the 590 Belleville portion of the Site, but that groundwater monitoring will need to continue under the Access Agreement and amendments thereto.

78.     Ridge Crossing disputed that active remediation at the 590 Belleville portion of the Site was complete as of May 31, 2018.

79.     On June 18, 2018, Plaintiffs, Defendants, RT Environmental, and GEI met to discuss the environmental work still required at both the 590 Belleville and

680 Schuyler portions of the Site, and it was agreed at this meeting that the parties would further amend their Access Agreement.

80.    By way of a Second Amendment to Remediation Access Agreement made effective as of July 31, 2018 between Ridge Crossing and Alent (the "Second Amendment"), the parties extended the non-exclusive, non-transferable, non-assignable, and temporary license granted by Ridge Crossing to Alent under the Access Agreement to October 27, 2018.

**Ridge Crossing Must Materially Change the Redevelopment Project as a result of Defendants' Remediation Failures**

81.    In or around mid-2018, as a result of Defendants' delays in performing the remediation, the Redevelopment Project had to be materially changed.

82.    Throughout the remainder of 2018 and 2019, Ridge Crossing worked to advance the amended Redevelopment Project while Defendants and GEI made feeble attempts to continue the remediation-related work at the Site.

83.    In February 2019, GEI, on behalf of Defendants, discovered chlorinated solvent concentrations in one of the wells located near a building on the 590 Belleville portion of the Site that required further investigation, thus ostensibly confirming Plaintiffs' assertion that remedial work at this portion of the Site as not complete.

84.    At that same time, with respect to the 680 Schuyler portion of the Site, GEI, on behalf of Defendants, advised that Defendants' remaining building had to be demolished to allow for remediation to continue.

85.    In light of these developments, by letter dated November 8, 2019, Plaintiffs requested an immediate plan of action from Defendants for completion of all necessary remediation activities on the Site, including with respect to the vapor intrusion concerns raised by, among other things, the new chlorinated solvents concentrations discovered in February 2019.  Plaintiffs also put Defendants on notice of the potential impact to its construction schedule and requested a new amendment to the Access Agreement.

86.    At the time of the November 8, 2019 letter, Defendants were again deficient in their remediation obligations, having promised a conceptual site model by August 31, 2019, which was never produced.

87.    At this time, Defendants and GEI were also supposed to be working on, among other things, post-remediation activities at and in relation to the 590 Belleville portion of the Site, vapor intrusion sampling at Buildings 29 and 30, removal of purge water, indoor air sampling and maintenance of a sub-slab depressurization system.

88.    In or around December 2019, Defendants confirmed that GEI had encountered PCE dense nonaqueous phase liquid ("DNAPL") during monitoring of

a well at the 590 Belleville portion of the Site in February 2019, thus again confirming that remedial activities at this portion of the Site were not complete.

89.    From 2019 through 2021, Ridge Crossing performed redevelopment activities at the 590 Belleville portion of the Site, which included raising the existing grade, construction of three new warehouse buildings and associated infrastructure, construction of a two-story building, and construction of related improvements, including retaining walls, landscaping new driveways and parking areas, sidewalks, and more.  But it was apparent that, because of the chlorinated solvents issues identified by Defendants, vapor intrusion work would be needed.

90.    By March 2022, nearly 15 years after Defendants started this process, little additional remediation work had been performed by Defendants, and thus GEI, on behalf of Defendants, submitted to the NJDEP a remedial timeframe extension request, seeking an extension of its regulatory remedial action timeframe to May 7, 2024.

91.    While construction was ongoing, GEI discovered additional vapor intrusion concerns at the new buildings being constructed by Plaintiffs at the 590 Belleville portion of the Site, which again confirmed the requirement for installation of vapor intrusion measures.

92.    GEI further advised that when the existing building on the 680 Schuyler portion of the Site was demolished, there was the possibility that soil will

need to be excavated from under the floor slab, and committed to work with Ridge Crossing and their contractors to determine if any type of sub-slab vapor mitigation system is necessary when new buildings were constructed at that portion of the Site.

93.    In accordance with the above promises, Plaintiffs thereafter attempted to coordinate the design work for the Redevelopment Project with Defendants and GEI.

94.    In February 2023, GEI advised Plaintiffs that it was struggling to develop an appropriate methodology to install a vapor barrier on the vertical portion of Plaintiffs' foundation walls and asserted that remediation was not "practical."

95.    As a result of Defendants' and GEI's inability to design an appropriate vapor barrier system, Plaintiffs were forced to change foundation design to a Secant Pile Wall System at a substantial loss of time and money.

96.    Despite the foundation design change to the Secant Pile Wall System, Defendants and GEI continued to refuse to coordinate with Plaintiffs on the vapor barrier design, which was plainly their responsibility.

97.    In early 2024, GEI mobilized to the 680 Schuyler portion of the Site to remove the slab of Defendants' old building, which had by then been

demolished, and to excavate soils that GEI had determined were contaminated by Defendants' historical operations.

98.    During that work, GEI discovered additional areas of soil impacted with hazardous substances from Defendants' historical operations and advised that additional delineation and remediation work would be required into June 2024.

99.    In or about August 2024, Plaintiffs commenced construction of the Secant Pile Wall System, which required substantial excavation and blasting of bedrock on the 680 Schuyler portion of the Site.

100.    As excavation progressed, Plaintiffs encountered yet more hazardous substances caused by Defendants' former operations.

101.    The contaminated soil material encountered by Plaintiffs could not be used as fill, and Plaintiffs were forced to stockpile that material for offsite disposal at substantial cost.

102.    As the construction and excavation continued, Plaintiffs received no substantive communications or assistance from Defendants or GEI, including with respect to a vapor barrier design or disposal of the contaminated soil.  Defendants also rejected multiple requests from Plaintiffs for meetings.

103.    In late 2024, despite the material clearly being linked to Defendants' historical operations, Defendants and GEI denied any responsibility for the remediation of the contaminated material discovered on the 680 Schuyler portion

of the Site and refused to engage in necessary remedial activities, including with respect to the needed vapor barriers.

104. By letter dated November 7, 2024, Plaintiffs again put Defendants on notice that they were not fulfilling their environmental remediation obligations at the Site and in breach of the Access Agreement, and they advised that Plaintiffs would perform the necessary environmental remediation in order to mitigate continuing delays and losses and thereafter seek reimbursement from Defendants.

105. Defendants did not substantively respond to Plaintiffs' warnings or notice of breach.

106. As of 2025, redevelopment at the 680 Schuyler portion of the Site is ongoing.

107. Despite continued requests from Plaintiffs, Defendants have refused to address and remediate their environmental contamination at the Site in an appropriate and timely manner.

108. In refusing and/or failing to complete the remediation of their contamination at and associated with the Site, Defendants have violated their obligations under applicable environmental laws, including the Spill Act, CERCLA, SRRA, the New Jersey Brownfield and Contaminated Sites Remediation Act, and the rules and regulations promulgated pursuant thereto.

109.   As a result of Defendants' refusal to perform the remediation, Plaintiffs were forced to incur, and are still incurring, significant sums of money in environmental investigation and remediation costs in connection Defendants' contamination, including with respect to the development and installation of vapor barriers to protect against Defendants' contamination and storage/disposal of Defendants' contaminated soil. This also included costs related to material changes to the Secant Wall System, which changes were caused by Defendants' contamination and included costs for imported soil materials.

110.   Though such work is not ultimately their responsibility, Plaintiffs, through RT Environmental, nonetheless have performed all environmental work in compliance with applicable environmental laws, including the National Contingency Plan ("NCP").

111.   The contamination and remediation-related costs incurred by Plaintiffs total at least $15,500,000, plus interest, and may continue to increase.

112.   In advancing the remediation, Plaintiffs have performed work and incurred substantial environmental costs that would have otherwise been Defendants' obligation.

## FIRST COUNT
### (CERCLA Liability)

113.    Plaintiffs incorporate the allegations of the preceding paragraphs as if set forth herein.

114.    The Site is a "facility" within Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

115.    There has been a "release" or "threatened release" of "hazardous substances" at the Site that has caused, and continues to cause, Plaintiffs to incur "response costs" within the meaning of CERCLA, 42 U.S.C. § 9601.

116.    Defendants were owners of the Site, and/or are successors-in-interest to an owner of the Site, and/or were in control of an owner of the Site, at the time of the releases and/or disposal of hazardous substances thereon, and, therefore, they are liable for damages and costs resulting from the contamination at and/or originating from the Site pursuant to Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

117.    Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), provides a right for contribution by a party against any other party who is liable or potentially liable under section 107(a) of CERCLA.

118.    Plaintiffs have a right under CERCLA, including 42 U.S.C. § 9613(f)(1), of contribution and/or complete indemnification from Defendants for

the cost of the investigation, cleanup and removal of the discharge of hazardous substances incurred to date and that will be incurred in the future.

## SECOND COUNT
### (Spill Act Liability)

119.   Plaintiffs incorporate the allegations of the preceding paragraphs as if set forth herein.

120.   The Spill Act provides that "[a]ny person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, without regard to fault, for all cleanup and removal costs no mater by whom incurred." N.J.S.A. 58:10-23.11g.c.

121.   The Spill Act also provides that "[w]henever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance." N.J.S.A. 58:10-23.11f.a(2).

122.   Although Plaintiffs have no responsibility for the prior discharges at the Site, due to Defendants' failures to satisfy their obligations, Plaintiffs incurred substantial costs in the investigation, clean up and removal of the discharges of hazardous substances at the Site, and they are continuing to incur related costs and fees.

123.   Defendants are dischargers and persons in any way responsible for the discharge of hazardous substances at the Site and are thus liable under the Spill Act to Plaintiffs for all their related costs and fees incurred and to be incurred.

124.   Defendants are strictly liable, jointly and severally, to Plaintiffs under the Spill Act for the costs of the cleanup and removal of hazardous substances at the Site.

### THIRD COUNT
**(Negligence)**

125.   Plaintiffs incorporate the allegations of the preceding paragraphs as if set forth herein.

126.   Defendants owed a duty to Plaintiffs to operate and maintain their properties in good order and condition, and to handle, store, treat, dispose of, discharge, or manage any hazardous substances in such a manner as to prevent any harm or injury to public health and welfare, the environment, or to Plaintiffs by controlling and preventing the discharge and/or release, or threat of discharge and/or release, of hazardous substances.

127.   Defendants also owed a duty to remediate their contamination in a good and workmanlike manner that is otherwise compliant with all applicable laws and regulations.

128.   As more fully set forth above, Defendants breached that duty and were negligent in their ownership and operation of the Site and their businesses and in their performance of the remediation of Defendants' contamination.

129.   Defendants' individual and/or collective negligence proximately caused, and is continuing to cause, Plaintiffs damages, including, but not limited to, costs incurred by Plaintiffs arising from or related to the investigation, clean up and removal of the discharge of hazardous substances at caused by Defendants at the Site, which is owned by Plaintiffs.

### FOURTH COUNT
### (Unjust Enrichment)

130.   Plaintiffs incorporate the allegations of the preceding paragraphs as if set forth herein.

131.   Defendants had an obligation under environmental law and the Access Agreement to perform the remediation of its contamination at and associated with the Site.

132.   Because Defendants refused to and/or failed to properly perform that work, Plaintiffs were forced to retain an environmental consultant and incur substantial costs to perform investigation and remediation in connection with Defendants' contamination.

133. The costs incurred by Plaintiffs to remediate Defendants' contamination would have otherwise been Defendants' responsibility under applicable laws, rules, and regulations.

134. Because Plaintiffs incurred remediation costs that would have otherwise been Defendants' responsibility, Defendants have been unjustly enriched, and Plaintiffs are entitled to recover those costs from Defendants.

## FIFTH COUNT
### (Breach of Contract)

135. Plaintiffs incorporate the allegations of the preceding paragraphs as if set forth herein.

136. As more fully set forth in the preceding paragraphs, Plaintiffs and Defendants were parties to an Access Agreement, as amended.

137. As more fully set forth above, under the Access Agreement and later amendments, Defendants agreed to indemnify Plaintiffs for all costs associated with Defendants' contamination at and associated with the Site.

138. As more fully set forth in the preceding paragraphs, Defendants materially breached the Access Agreement, as amended, by failing to properly remediate their contamination.

139. In effort to mitigate damages, and because Defendants refused to and/or failed to properly perform the environmental work at the Site, Plaintiffs were forced to retain an environmental consultant and incur substantial costs to

perform investigation and remediation in connection with Defendants' contamination.

140.   As more fully set forth in the preceding paragraphs, Defendants are required to indemnify Ridge Crossing for losses resulting from their negligence and failure to perform and complete the environmental work in conformance with all applicable laws, rules, and regulations.

141.  Plaintiffs have incurred, and will continue to incur substantial damages, as a result of Defendants' material breaches and/or refusal to indemnify Plaintiffs for their losses.

142.   Plaintiffs are entitled to recover those damages from Defendants.

**WHEREFORE**, Plaintiffs, Ridge Crossing Limited Liability Company, Ridge Crossing 1 Urban Renewal LLC, Ridge Crossing 6-1 Urban Renewal LLC, Ridge Crossing 6-2 Urban Renewal LLC, Ridge Crossing 6-3 Urban Renewal LLC,  Ridge Crossing 6-4 Urban Renewal LLC, Ridge Crossing 6-5 LLC, and Ridge Crossing 6-6, LLC, demand Judgment against Defendants, Alent, Inc., Alpha Assembly Solutions, Inc., John Does 1-10, and XYZ Corps. 1-10, jointly and severally, for all relief that they are entitled to in law and equity, and specifically as follows:

(a)    An Order declaring Defendants jointly and severally liable to Plaintiffs for any and all costs or damages that have resulted and may

result from the discharges/releases of hazardous substances at and from the Site and the remediation thereof, plus interest;

(b)    Awarding compensatory and consequential damages, including, but not limited to, all costs incurred by Plaintiffs arising from or related to the investigation, clean up, removal and remediation of the discharges/releases of hazardous substances at the Site, plus interest;

(c)    A declaration that Defendants are obligated to indemnify Plaintiffs for all past, present and future costs and expenses, including attorneys' fees and costs of suit, incurred and which may be incurred in connection with the investigation, cleanup and remediation of contamination existing at or originating from the Site, plus interest;

(d)    An Order requiring Defendants to complete all outstanding environmental work at and in connection with the Site;

(e)    Awarding attorney's fees and costs;

(f)    Awarding pre- and post-judgment interest; and

(g)    Awarding such other relief as the Court deems just and proper.

Respectfully submitted,

**LOWENSTEIN SANDLER LLP**
*Attorneys for Plaintiffs*

Dated:  August 14, 2025

By:    */s/ Christoper Porrino*
        Christopher Porrino
        Mark S. Heinzelmann

One Lowenstein Drive
Roseland, New Jersey 07068
T: 973.597.2500
F: 973.597.2400
cporrino@lowenstein.com
mheinzelmann@lowenstein.com

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2</u>

I hereby certify that to my knowledge the subject matter of this proceeding is not the subject of any other pending court action, or of any pending arbitration or administrative proceeding, and that at this time Plaintiffs are not aware of any other parties that should be joined in this matter. I certify that the foregoing statements by me are true and correct to the best of my knowledge, information and belief. I am aware if any of these statements by me are willfully false, I am subject to punishment.

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  August 14, 2025                    By: ___*/s/ Christoper Porrino*___
                                                    Christopher Porrino